**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CLARENCE BROWN, TIMOTHY GREENLEE, ) <br> DEBORAH HOBBS, DESIR MARTIAL, ) <br> MADISON MOON, DYLAN PALMER, ) <br> CRAIG PERRY, JAMIKA RANDLE, ) <br> SAMMIE SPENCER, CHARLES STACKER, ) <br> BRENDA TAYLOR-TURNER, DAVID TAYLOR, ) <br> NATASHA TURNER-RANDLE, and ) <br> SHARON PRESTON, ) <br> on BEHALF OF THEMSELVES and all ) <br> SIMILARLY SITUATED AFRICAN-AMERICAN ) <br> CURRENT AND FORMER EMPLOYEES OF ) <br> REXAM BEVERAGE CAN AMERICAS INC., ) <br> ) <br>      Plaintiffs, ) <br> ) <br>      v. ) <br> ) <br> REXAM PLC, a foreign corporation, d/b/a ) <br> REXAM BEVERAGE CAN AMERICAS INC., ) <br> a registered Delaware corporation and as ) <br> REXAM BEVERAGE CAN COMPANY, ) <br> a registered Illinois corporation, ) <br> ) <br>      Defendant. ) | Case No. <br><br> <u>Jury Trial Requested</u> |

**<u>COMPLAINT</u>**

NOW COME Plaintiffs, CLARENCE BROWN, TIMOTHY GREENLEE, DEBORAH HOBBS, DESIR MARTIAL, MADISON MOON, DYLAN PALMER, CRAIG PERRY, JAMIKA RANDLE, SAMMIE SPENCER, CHARLES STACKER, BRENDA TAYLOR-TURNER, DAVID TAYLOR, NATASHA TURNER-RANDLE, AND SHARON PRESTON, on behalf of themselves and all similarly situated current and former African-American employees of REXAM PLC, a foreign corporation, d/b/a REXAM BEVERAGE CAN AMERICAS INC., a registered Delaware corporation and as REXAM BEVERAGE CAN

COMPANY, a registered Illinois corporation (hereinafter "Rexam" or "Defendant"), by and through their attorneys THE LAW OFFICE OF CAROL COPLAN BABBITT and THE BRESSLER FIRM LLC, and complaining of Defendant, states as follows:

## NATURE OF THE ACTION

1. This is an action seeking redress for violations of rights guaranteed to Plaintiffs under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., as amended, and The Illinois Human Rights Act, 775 ILCS 5/1-103, and Plaintiffs seek mandatory injunctive relief and damages to redress Defendant's discriminatory employment practices.

2. Plaintiffs allege that Defendant has created a racially hostile work environment. Examples include, but are not limited to, (1) failing to respond to Plaintiffs' repeated complaints about racial discrimination and harassment in the workplace which has included racial slurs and other racially offensive language, and multiple nooses, racially derogatory images, drawings and photographs, including swastikas, confederate flags, and monkeys, all of which have appeared in Defendant's public work areas; (2) failing to investigate Plaintiffs' complaints, and failing to take appropriate disciplinary action against offending employees; (3) failing to respond to Plaintiffs' repeated complaints that coworkers, including supervisors, used, and continue to use, racial slurs, and failing to take appropriate disciplinary action against those individuals who used, and continue to use, racial slurs including, but not limited to, frequent and open use of the word "nigger" in public work areas.

3. Plaintiffs allege that Defendant has subjected them to disparate treatment on account of their race. Examples include, but are not limited to, (1) subjecting Plaintiffs to more stringent disciplinary action than similarly situated Caucasian co-workers, biased enforcement of basic company rules, assigning the African-American employees to less desirable, more

physically demanding, or demeaning work assignments than the Caucasian co-workers and (2) providing training, advancement, or promotions to Caucasian co-workers who had worked for less time than Plaintiffs instead of, or before, promoting the Plaintiffs and the other African-Americans and targeting African-Americans by conducting performance evaluations designed to judge African-American employees more harshly to keep them from getting promoted.

## JURISDICTION AND VENUE

4.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) and (4) and 28 U.S.C. §1331 to secure protection of and to redress deprivation of rights secured by 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., as amended, and The Illinois Human Rights Act, 775 ILCS 5/1-103.

5.      Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391 because the unlawful conduct alleged herein was committed, and continues to occur, within the boundaries of the Northern District of Illinois.

## PARTIES

6.      Plaintiff Clarence Brown is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On October 30, 2012 Plaintiff Brown timely filed a Charge of Discrimination against the Defendant based on race with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"). On April 9, 2014, the EEOC issued Plaintiff Brown a Notice of Right to Sue. A copy of Plaintiff Brown's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

7.      Plaintiff Timothy Greenlee is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012

Plaintiff Greenlee timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Greenlee a Notice of Right to Sue. A copy of Plaintiff Greenlee's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

8.      Plaintiff Deborah Hobbs, is an adult African-American female citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Hobbs timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Hobbs a Notice of Right to Sue. A copy of Plaintiff Hobbs' Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

9.      Plaintiff Madison Moon is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Moon timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Moon a Notice of Right to Sue. A copy of Plaintiff Moon's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

10.     Plaintiff Dylan Palmer is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Palmer timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Palmer a Notice of Right to Sue. A copy of Plaintiff Palmer's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

11.     Plaintiff Craig Perry is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On September 26, 2012

Plaintiff Perry timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Perry a Notice of Right to Sue. A copy of Plaintiff Perry's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

12.     Plaintiff Jamika Randle is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Randle timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Randle a Notice of Right to Sue. A copy of Plaintiff Randle's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

13.     Plaintiff Sammie Spencer is an adult African-American male citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Spencer timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Spencer a Notice of Right to Sue. A copy of Plaintiff Spencer's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

14.     Plaintiff Charles Stacker is an adult African-American male citizen of the Untied States who resides in Indiana and is currently employed by Defendant. On July 9, 2012 Plaintiff Stacker timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Stacker a Notice of Right to Sue. A copy of Plaintiff Stacker's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

15.     Plaintiff Brenda Taylor-Turner is an adult African-American female citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Taylor-Turner timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Taylor-Turner a Notice of Right to Sue. A copy of Plaintiff Taylor-Turner's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

16.     Plaintiff Natasha Turner-Randle is an adult African-American female citizen of the Untied States who resides in Illinois and is currently employed by Defendant. On July 9, 2012 Plaintiff Turner-Randle timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Turner-Randle a Notice of Right to Sue. A copy of Plaintiff Turner-Randle's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

17.     Plaintiff Desir Martial is an adult African-American male citizen of the Untied States who, at all times relevant to this lawsuit, resided in Illinois and is a former employee of Defendant. On July 9, 2012 Plaintiff Martial timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Martial a Notice of Right to Sue. A copy of Plaintiff Desir Martial's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

18.     Plaintiff David Taylor is an adult African-American male citizen of the Untied States who resides in Illinois and is a former employee of Defendant. On July 9, 2012 Plaintiff Taylor timely filed a Charge of Discrimination against Defendant based on race with the IDHR and the EEOC. On April 9, 2014, the EEOC issued Plaintiff Taylor a Notice of Right to Sue. A

copy of Plaintiff Taylor's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

19. Plaintiff Sharon Preston is an adult African-American female citizen of the Untied States who resides in Illinois and is a former employee of Defendant. On April 15, 2013 Plaintiff Preston timely filed a Charge of Discrimination against Defendant based on race, sex, disability, and retaliation with the EEOC. On August 26, 2013 Plaintiff Preston timely filed an Amended Charge of Discrimination against Defendant with the IDHR and the EEOC. On May 12, 2014, the EEOC issued Plaintiff Preston a Notice of Right to Sue. A copy of Plaintiff Preston's Notice of Right to Sue is attached to this Complaint in Group Exhibit 1.

20. Defendant is a publically traded British multinational consumer packaging company doing business in Illinois with its North American Headquarters located in Cook County, Illinois, that employs approximately 11,000 people at 67 plants in 24 countries including the United States. On February 20, 2014 Defendant issued a Press Release reporting £3,943,000,000 British Pound Sterling (approximately $6.7 billion U.S. Dollars) in sales and £95,000,000 British Pound Sterling (approximately $160 million U.S. Dollars) in total profit. Defendant also stated on their website, "We are pleased to have achieved our 15% ROCE target. We also grew 2013 profits by 4% and have proposed a 14% increase in the dividend to 17.4p. It has been a great team effort."

21. Defendant has operated and managed at least two manufacturing facilities in Illinois where the alleged discrimination took place, one at 1101 W 43rd Street Chicago, Illinois 60609 (hereinafter the "Beverage Can Facility") and another at 2250 Lively Blvd, Elk Grove Village, Illinois 60007 (hereinafter the "Cap Can Facility") that closed on, or about, March 29, 2013.

22.     Defendant maintains its corporate offices in the United States at 8770 W. Bryn Mawr Avenue, Chicago, Illinois 60631 and has as its registered agent, National Registered Agents Inc., 200 West Adams Street, Chicago, Illinois 60606. Defendant has combined personnel for Human Resources for all Chicago area locations. For example, employees at both the Beverage Can Facility and the Cap Can Facility shared one Personnel Manager, Steven Austin. Policies and procedures were similar at the Beverage Can Facility and the Cap Can Facility and further, corporate oversight was identical.

## CLASS ALLEGATIONS DEFINITION OF THE CLASS

23.     The representative Plaintiffs sue on behalf of themselves and on behalf of all similarly situated current and former African-American employees employed by Defendant between April 1, 2010 and the present at the Beverage Can Facility or the Cap Can Facility. The Hostile Work Environment Class consists of all current and former African-American employees employed by Defendant at the Beverage Can Facility or Cap Can Facility between April 1, 2010 and the present.  Plaintiffs' charges of discrimination sufficiently put Defendants on notice as they presented issues affecting not only themselves but an entire class of people.

## HOSTILE WORK ENVIRONMENT/RACIAL HARASSMENT

24.     Defendant subjected Plaintiffs to a racially hostile work environment by tolerating the repeated hanging of nooses, amounting to four (4) in total that Plaintiffs' conjunctively are aware of, including a noose hung in May of 2012 with an upside down bucket directly underneath it, swastikas, confederate flags, and other racially charged symbols such as images and pictures of monkeys displayed in conspicuous places in the workplace including on work equipment used by African-American employees.

25.     Defendant subjected Plaintiffs to a racially hostile work environment by tolerating the persistent use of public racially derogatory slurs and language in the workplace, including, but not limited to, repeated use of the word "nigger" in regular conversations such as "It was a nigger" "Don't tell that nigger bitch" and openly referencing and/or singing songs with lyrics such as "nigga" in reference to violence, using the word "chitlin" several times in reference to food that African-American employees were eating or would want to eat and referring to African Americans employees as "drug dealers."

26.     Defendant subjected Plaintiffs to a racially hostile work environment by allowing Caucasian supervisors to aggressively and negatively scrutinize Plaintiffs' job performance, enforce workplace rules in a biased manner, evaluate the African-American employees in a more stringent manner directly affecting their income and refusing African-American employees crucial training that would afford promotion, while not subjecting similarly situated Caucasian co-workers to similar treatment.

27.     Defendant subjected Plaintiffs to disparate treatment due to their race by failing to document Plaintiffs' repeated complaints of race discrimination. After Plaintiffs complained about the discrimination their work environment became even more hostile by the continuing and repeated comments to Plaintiffs by Caucasian co-workers that their discrimination claims were the cause of layoffs and general unrest in the work environment which made Plaintiffs feel even more ostracized in the workplace.

28.     Defendant failed to adequately address or respond to Plaintiffs' complaints of racial harassment made to company officials, including, but not limited to, direct supervisors, management, and the Human Resources department.

## DISPARATE TREATMENT DUE TO RACE

29.     Defendant subjected Plaintiffs to disparate treatment due to their race by allowing supervisors to assign more strenuous work to Plaintiffs than to similarly situated Caucasian co-workers.

30.     Defendant subjected Plaintiffs to disparate treatment due to their race by promoting similarly situated Caucasian co-workers, as well as Caucasian co-workers who had worked for Defendant for a shorter time, instead of or before promoting Plaintiffs, which directly affected Plaintiffs' ability to earn higher wages.

31.     Defendant subjected Plaintiffs to disparate treatment due to their race by denying Plaintiffs opportunities that would eventually allow them to be promoted while giving such opportunities to similarly situated Caucasian co-workers.

32.     Defendant subjected Plaintiffs to disparate treatment due to their race by forcing injured Plaintiffs to take shorter sick leaves than similarly situated Caucasian co-workers.

33.     Defendant subjected Plaintiffs to disparate treatment due to their race by disciplining them for infractions for which similarly situated Caucasian co-workers were not disciplined, including, but not limited to, returning late to work after breaks, talking to each other.

34.     Defendant subjected Plaintiffs to disparate treatment due to their race by disciplining them without proper investigation, in contrast to their treatment of similarly situated Caucasian co-workers.

35.     Defendant subjected Plaintiffs to disparate treatment due to their race by allowing similarly situated Caucasian co-workers to take more time off than Plaintiffs.

36.     Defendant subjected Plaintiffs to disparate treatment due to their race by giving them less desirable work shifts than similarly situated Caucasian co-workers, and by denying them the opportunity, afforded to similarly situated Caucasian co-workers to choose with which colleagues they worked which affected Plaintiffs' emotional status as well as demeaned them in front of the Caucasian co-workers.

37.     Defendant subjected Plaintiffs to disparate treatment due to their race by failing to afford them proper training, failing to allow African-American supervisors to attend the "Rexam Academy" for training, continually treating them disparately in evaluations and thus, causing them not to be eligible for promotions to earn more money. Rexam hands out the more menial, dirty jobs to the African Americans while continually providing less work and more favorable work to the Caucasian co-workers. Moreover, Rexam, in the face of numerous and horrific racially charged symbols such as nooses, swastikas, and open use of the word "nigger" by Caucasian co-workers in the work place, ignores all complaints and allows these ghastly symbols to continually appear and reappear in the workplace; all of these actions have affected, and continue to affect, the Plaintiffs and the purported class and damages them emotionally and financially.

## CLASS REQUIREMENTS MET

38.     The individuals in the Class are so numerous that joinder of all members is impracticable. Plaintiffs estimate that there are approximately 30 members of the Class.

39.     There are questions of law and fact common to the Class that predominate over questions affecting only individuals. Among these common questions are:

a.     Whether Defendant created a racially hostile work environment or failed to remedy and prevent a racially hostile work environment;

b. Whether there was a disparity between offered training and promotional opportunities;

c. Whether there was a disparity between the extent and gravity of discipline imposed upon Plaintiffs and the extent and gravity of discipline imposed upon similarly situated Caucasian co-workers;

d. Whether Defendant failed to address Plaintiffs' complaints about racial harassment and discrimination;

e. Whether Defendant failed to give Plaintiffs equal work benefits such as overtime work, and desirable work shifts yet granted these benefits to similarly situated Caucasian co-workers.

40.     The claims of the representative parties are typical of the claims of the class.

## INDIVIDUAL NAMED PLAINTIFF'S CLAIMS

### Plaintiff Clarence Brown's Individual Complaints

41.     Plaintiff Brown started working as a Spray Room Operator and a full-time employee for Defendant in 2003. Plaintiff Brown currently works for Defendant as a CPO Operator and has had this position since 2006.

42.     During his employment with Defendant, Plaintiff Brown was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a. Being subjected to disparate treatment in discipline for inconsequential errors such as overfilling an oil tank while in contrast, similarly situated Caucasian co-workers were not similarly disciplined;

12

b. Being subjected to disparate treatment in that he is subjected to heightened scrutiny in his work performance as his supervisor has targeted, questioned and criticized Plaintiff Brown and his work product including re-checking his work, questioning him on other Caucasian co-worker's work product, automatically assuming Plaintiff Brown was the one who erred if there is any discrepancy, and attempting to blame him for a mistake that he did not make, while in contrast similarly situated Caucasian co-workers were not similarly treated;

c. Being subjected to disparate treatment by not receiving *any* training on certain testing, despite his requests for training, while in contrast similarly situated Caucasian co-workers received training which has made them more eligible to earn more money;

d. Being subjected to disparate treatment in the transfer and/or promotion to better positions because during his employment at Rexam, he has never been promoted to a supervisor position or been moved to a mechanics position which provides better pension and benefits;

e. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing multiple nooses and a monkey figure hung in the workplace; seeing swastikas and confederate flags displayed in the workplace; hearing a Caucasian co-worker publicly saying the term "nigger" in the break room in front of approximately fifteen to twenty people; hearing a Caucasian co-worker say to a Caucasian co-worker in the break room, "These niggers up here are lazy;" hearing a Caucasian co-worker say in the break room, "Man, that nigger can run;"

13

f.  In addition to the items identified herein, Plaintiff Brown was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

43.  Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment during their employment with Defendant due to their race.

44.  During Plaintiff Brown's employment, Defendant was aware of Plaintiff Brown's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff Timothy Greenlee's Individual Claims**

45.  Plaintiff Greenlee started working as a full time employee as a Forklift Operator in 2006. Plaintiff Greenlee currently works for Defendant as a Forklift Operator, the same position as when he started as a full time employee.

46.  During his employment with Defendant, Plaintiff Greenlee was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a.  Plaintiff Greenlee was threatened with getting shot by a Caucasian supervisor, a Caucasian co-worker accused him and the "blacks" of causing a layoff, he heard racially derogatory comments about eating "chitlins" and him being a "drug dealer" and another Caucasian co-worker said "I hate black people" in his presence, in

14

addition to working next to a Caucasian co-worker that routinely wore clothing bearing confederate flags;

b. In addition he endured unequal enforcement of company break rules and policies by personally observing other Caucasian co-workers not getting reprimanded for leaving breaks early, talking on the job site, using cell phones on the job site, and yet he was reprimanded and/or disciplined for the same;

c. Plaintiff Greenlee was assigned more difficult and demanding work tasks as well as those work tasks involving dirtier, more dangerous tasks such as cleaning assignments that required him to climb a "scissor lift," without any training, which Caucasians were not assigned to do, he was also denied assistance on the more demanding job tasks he was assigned and he then was subjected to stricter scrutiny of his work performance than Caucasian co-workers;

d. Plaintiff Greenlee was denied access to promotional opportunities, including being denied the opportunity to apply to become a mechanic which would have afforded him the opportunity for better pension and benefits;

e. Plaintiff was disparately treated in requesting time for a funeral by being required to show proof of funeral services while other, similarly situated Caucasian co-workers were given grief leave without providing such proof;

f. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing a photo of the May 2012 noose hung in the workplace; seeing confederate flags worn on clothing of Caucasian co-workers in the workplace; seeing monkey images in the workplace; hearing Caucasian co-workers and

supervisors say, "nigger" "I hate black people" "I don't like black people" and "You are the biggest dope dealer in the plant;"

g. In addition to the items identified herein, Plaintiff Greenlee was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

47. Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment during their employment with Defendant due to their race.

48. During Plaintiff Greenlee's employment, Defendant was aware of Plaintiff Greenlee's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

### Deborah Hobbs' Individual Claims

49. Plaintiff Hobbs started working as a Quality Control Inspector and a full-time employee for Defendant in 1999. Plaintiff Hobbs currently works for Defendant as a Palletizer Operator and has had this position since 2012.

50. During her employment with Defendant, Plaintiff Hobbs was subjected to discrimination due to her race. Examples of this discrimination include, but are not limited to, the following:

a. Being subjected to disparate treatment in the enforcement of break rules and policies, work rules regarding emergency telephone calls, as she was, for example,

reprimanded for leaving the break room late when the Caucasian co-workers were still in the break room;

b. Being subjected to disparate treatment in the punishment and/or discipline for inconsequential work errors such as making mistakes in the canning process and "running bad cans" while in contrast, similarly situated Caucasian co-workers were not similarly punished and/or disciplined, and in some cases not punished at all, for similar or worse errors or misconduct. Further, unlike when Caucasian co-workers made errors in the workplace, Plaintiff Hobbs' supervisor regularly punished her and embarrassed her by publicizing that it was her crew who erred while not similarly publicizing the errors made by similarly situated Caucasian co-workers and drawing attention to their crews;

c. Being subjected to disparate treatment in the assignment of jobs such as being assigned the greasy cleanup jobs where the Caucasian co-workers did not have to do these tasks, and in job transfer into the mechanics position which would provide better pension and benefits and/or promotion to better positions because during her employment at Rexam, she has never been promoted to a better position or a supervisor position while in contrast, similarly situated Caucasian co-workers at her skill level have been promoted to better positions and have been made supervisors. Plaintiff Hobbs has even been forced to train the Caucasian co-workers who were promoted above her;

d. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing a noose hung in the workplace in 2012; seeing monkey images displayed in the workplace; hearing Caucasian co-workers and supervisors

say, "Dumb black cu*t" "I hate that black bitch" "These niggers up in here are lazy" and the use of the word "nigger" in a racially derogatory rap song sung out loud and publically by Caucasian co-workers in the workplace;

e.   In addition to the items identified herein, Plaintiff Hobbs was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

51.   Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

52.   During Plaintiff Hobbs' employment, Defendant was aware of Plaintiff Hobbs' complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff Desir Martial's Individual Claims**

53.   Plaintiff Martial was hired by Defendant in 2006 as a Maintenance Supervisor and started as a full time employee.  Plaintiff Martial was constructively discharged by Defendant on or about June 29, 2012 and is no longer employed at Rexam.  When Plaintiff was constructively discharged in 2012, he was still in the same general position that he was when he was hired.

54.   During his employment with Defendant, Plaintiff Martial was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment in that he was subjected to heightened scrutiny in his work performance as Rexam management unreasonably expected more of him than his vastly more experienced Caucasian predecessor, and criticized and ridiculed him for doing his job and correcting his predecessor's mistakes and substandard performance while in contrast, similarly situated Caucasian co-workers were not similarly criticized, ridiculed or subjected to such heightened scrutiny and unreasonable expectations;

b.  Being subjected to disparate treatment by not receiving training after asking for special training such as "Rexam Academy" and being denied while in contrast, similarly situated Caucasian co-workers received training;

c.  Being subjected to disparate treatment by not receiving a fair opportunity for raises and bonuses or transfer and/or promotion to better positions because during his employment at Rexam, he was never promoted to a better position, despite bidding for better, higher paying positions and already performing the work load for the new position, while in contrast, similarly situated Caucasian co-workers were transferred and/or promoted to better positions;

d.  Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: observing a noose in the workplace in or about May of 2012; hearing racial slurs directed at him such as "I've never seen a black man well-mannered that carries himself like you;" being told by the plant manager not to get offended by the use of the word "nigger" and that it was an acceptable word because his father, who was a police officer used the word "nigger" frequently;

e. In addition to the items identified herein, Plaintiff Martial was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

55. Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

56. During Plaintiff Martial's employment, Defendant was aware of Plaintiff Martial's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

### Plaintiff Madison Moon's Individual Claims

57. Plaintiff Moon started working as a Printer Operator and a full-time employee for Defendant in 1999, and he is still in the same position that he was when he was hired.

58. During his employment with Defendant, Plaintiff Moon was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a. Being subjected to disparate treatment in the assignment of work tasks as he was assigned more difficult and demanding, and less favorable, tasks such dirty, oily cleaning jobs while in contrast, similarly situated Caucasian co-workers were not assigned such tasks; being subjected to disparate treatment in the enforcement of break rules and policies by being disciplined for leaving the break room late when the Caucasians were still in the break room;

b.   Being subjected to disparate treatment in the punishment and/or discipline for errors such as making mistakes in the canning process and "running bad product" while in contrast, similarly situated Caucasian co-workers were not similarly punished and/or disciplined, and in some cases not punished at all, for similar or worse errors or misconduct;

c.   Being subjected to disparate treatment in the denial of "light duty" when Plaintiff Moon was injured while in contrast, similarly situated Caucasian co-workers were afforded "light duty" positions;

d.   Being subjected to disparate treatment in the cancelling of scheduled overtime while in contrast, the scheduled overtime of similarly situated Caucasian co-workers was not cancelled;

e.   Being subjected to disparate treatment in the transfer and/or promotion to better, higher paid positions because during his employment at Rexam, he has never been promoted or transferred to a higher paying position or trained to be a supervisor although he is qualified, and he is still in the same position that he was when he was hired, while in contrast, similarly situated equally or less qualified, Caucasian co-workers have been transferred and/or promoted to better positions and have been made supervisors;

f.   Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing two nooses hung in the workplace; seeing confederate flags worn in the workplace; being shown an internet photo by a Caucasian co-worker of Caucasian children taunting black children; hearing a Caucasian co-worker tell a racial joke in the cafeteria, "Why can't a nigger do _____?" hearing a

Caucasian co-worker say to Rexam supervisors after he was reported for making a derogatory comment to an African-American worker, "I don't see what the big deal is. He's just a nigger;" hearing a manager say "lazy nigger" right in front of the Plant Manager's office while he was inside; hearing the Caucasian Plant Manager say not to get offended by the use of the word "nigger" and that it was acceptable because his father, who was a police officer used the word "nigger" frequently;

g.  In addition to the items identified herein, Plaintiff Moon was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

59.     Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

60.     During Plaintiff Moon's employment, Defendant was aware of Plaintiff Moon's complaints as enumerated above, but failed to take corrective action or prevent further discrimination. Plaintiff Moon is aware that the Union tried to get involved and conduct an investigation to address the racial harassment and Rexam refused.

**Plaintiff Dylan Palmer's Individual Claims**

61.     Plaintiff Palmer started working as a Palletizer Operator and a full-time employee for Defendant in 1996, and he is still in the same position that he was when he was hired.

62.     During his employment with Defendant, Plaintiff Palmer was and continues to be subject to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment in the assignment of work tasks as he was assigned more difficult and demanding, and less favorable, tasks such as dangerous cleaning jobs including cleaning under the IVO oven which was a flammable area and cleaning a machine very high up while in contrast, similarly situated Caucasian co-workers were not assigned such tasks;

b.  Being subjected to disparate treatment in the promotion to a mechanic position because as he was denied the opportunity to become a mechanic, he was also denied the opportunity for better pay and a better pension, while in contrast, similarly situated Caucasian co-workers were not similarly denied the mechanic position;

c.  Being subjected to disparate treatment in the denial of benefits such as the "Blue Chip" stock benefit while in contrast, similarly situated Caucasian co-workers were not denied the "Blue Chip" stock benefit;

d.  Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing photos of the May 2012 noose which was hung in the workplace; seeing confederate flags worn in the workplace; seeing a gorilla image placed on the vehicle of an African-American co-worker; seeing a gorilla image placed on the Coke machine in the workplace; seeing a monkey image found on the window in the smoking area; hearing about additional nooses and swastikas displayed by Caucasian co-workers in the work place; hearing a Caucasian supervisor use the word "nigger" on multiple occasions; being referred to as "nigger rich" by a

Caucasian co-worker; hearing a Caucasian co-worker say, "I want to kill all you blacks;" hearing Caucasian co-workers use the term "nigger" many times such as "God, I hate niggers" "I can't stand these niggers" "All these niggers should be fired" and in reference to a black Rexam manager, "They have a monkey in charge" "That nigger makes me sick, corporate will get rid of him" and "I don't know what the big deal is, he is just a nigger" and hearing about a Caucasian co-worker who stated, "Nigger, either sink or swim;"

e.  In addition to the items identified herein, Plaintiff Palmer was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

63.  Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

64.  During Plaintiff Palmer's employment, Defendant was aware of Plaintiff Palmer's complaints as enumerated above, but failed to take corrective action or present further discrimination. In several instances Rexam management responded to Plaintiff Palmer's complaints of the above discrimination by telling him "Don't make waves" "Try to get along" "Don't worry about it" and 'They are just words" when reporting the racial slurs.

## Plaintiff Craig Perry's Individual Claims

65.     Plaintiff Perry started working as a Spray Room Operator and a full-time employee for Defendant in 2012, and he is still in the same position that he was when he was hired.

66.     During his employment with Defendant, Plaintiff Perry was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment in the assignment of work tasks as he was assigned, against his wishes and despite his greater seniority, the lesser position of "sorter" because Rexam needed someone to "clean" which caused him to lose months of comparable pay and valuable work experience while in contrast, similarly situated Caucasian co-workers, with lesser seniority, were not assigned this lesser position;

b.  Being subjected to disparate treatment by not receiving *any* training when transferred to a new position. Plaintiff Perry wanted to be transferred to the better position of QC Specialist and asked for the required training.  Rexam denied him *any and all* training for the QC Specialist position and because he had no training, Rexam removed him from that position and returned him back to his prior position. In contrast, Rexam provides training to similarly situated Caucasian co-workers when they are transferred to the QC Specialist position. Plaintiff Perry is still in the same position that he was when he was hired;

c.  Being subjected to disparate treatment in the requirement to undergo testing prior to hiring while in contrast, similarly situated Caucasian co-workers did not have to undergo testing;

d. Being subjected to disparate treatment in the promotion to a mechanic position because as he was denied the opportunity to become a mechanic, he was also denied the opportunity for better pay and a better pension, the opportunity for more autonomy and freedom in the workplace, the opportunity for more benefits, and the opportunity to succeed and advance. Plaintiff Perry was discouraged and made to feel that he should not apply for a mechanic position and was pushed down before he even applied. While in contrast, similarly situated Caucasian co-workers were not similarly discouraged and made to feel that they should not apply, and they in fact were promoted to mechanic positions;

e. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing the May 2012 noose which was hung in the workplace; seeing photos of other nooses hung in the workplace; seeing monkey images at the work place, including a monkey image drawn on the window in the smoking area in 2012; hearing a Caucasian co-worker singing a phrase "I'll pull a 187 on a no good nigga ass." ("187" is police radio code for murder, death, or kill); hearing a Caucasian co-worker saying the words "nigger" and "you people" when referring to African-American workers; and a Caucasian co-worker stating, "First we let them in the White House, now they are winning marathons. They're everywhere;"

f. In addition to the items identified herein, Plaintiff Perry was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

26

67.     Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

68.     During Plaintiff Perry's employment, Defendant was aware of Plaintiff Perry's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff Jamika Randle's Individual Claims**

69.     Plaintiff Randle started working as a Forklift Driver and a full-time employee for Defendant in 2005. Plaintiff worked for Defendant as a Quality Control Inspector from 2012 until 2014. However, Plaintiff Randle was wrongfully terminated on or about March 24, 2014 and at the time of the filing of this complaint, the termination is pending arbitration per his union contract.

70.     During his employment with Defendant, Plaintiff Randle was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a. Being subjected to disparate treatment in the assignment of work tasks as he was assigned more difficult and demanding, and less favorable, tasks such a dirty, oily cleaning jobs or jobs in other departments while in contrast, similarly situated Caucasian co-workers were not assigned such tasks;

b. Being subjected to disparate treatment in that he is subjected to heightened scrutiny in his work performance as he is unequally disciplined and/or punished for the mistakes of others, his mistakes are made public by Rexam Human Resources, Rexam managers and supervisors overly check his work and compare it to the work of his

Caucasian counterparts, Rexam managers stand over him while he works, and rush him through his work with false justification while in contrast, similarly situated Caucasian co-workers were not similarly disciplined treated;

c. Being subjected to disparate treatment by not receiving *any* training on machinery, despite his requests for training, while in contrast similarly situated Caucasian co-workers received training;

d. Being subjected to disparate treatment in the transfer and/or promotion to better positions such as a mechanic which has better pension and benefits, because he was denied when he applied for a better position, and on a second occasion, he was discouraged from seeking a better position, while in contrast similarly situated Caucasian co-workers have been transferred and/or promoted to better positions, Plaintiff Randle was once told if he didn't like not going to the mechanics position to "just quit;"

e. Being wrongfully terminated on or about March 24, 2014 based upon false accusations;

f. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing a noose hanging in the workplace in 2012*,* finding a noose in his locker in 2012; seeing an image of a monkey in the break room; hearing a Caucasian co-worker saying the term "nigger" frequently including singing a phrase "I'll pull a 187 on a no good nigga ass." ("187" is police radio code for murder, death, or kill); a comment by a co-worker, "What is the easiest way to keep a black man down? Put any information in a book;" and "Would you care for some chitlins?" and "Are those chitlins and chocolate?"

28

g.   In addition to the items identified herein, Plaintiff Randle was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

71.   Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

72.   During Plaintiff Randle's employment, Defendant was aware of Plaintiff Randle's complaints as enumerated above, but failed to take corrective action or prevent further discrimination and even discouraged Randle from complaining about race discrimination by telling him "not to rock the boat" and by failing to resolve any reported issues.

73.   In 2012 Plaintiff Randle went to the Plant Manager for help due to the emotional stress he had been experiencing from racial discrimination in the workplace. Plaintiff Randle asked about EAP counseling services, a company benefit available to employees. The Plant Manager told Plaintiff Randle, "If you are really that stressed out, you should just quit."

**Plaintiff Sammie Spencer's Individual Claims**

74.   Plaintiff Spencer started working as a Mill Wright and a full-time employee for Defendant in 2012, and he is still in the same position that he was when he was hired.

75.   During his employment with Defendant, Plaintiff Spencer was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a. Being subjected to disparate treatment in the assignment of work tasks as the majority of the time, he was assigned more difficult and demanding, and less favorable, tasks such as emptying garbage cans and cleaning the spilled debris, changing motors in the pit, plumbing and fabricating jobs and getting inside the big "ovens," while in contrast, similarly situated Caucasian co-workers were either not assigned these tasks the majority of the time or not assigned these tasks at all, in addition, he was assigned to complete the majority of work to be accomplished in a particular work shift giving him "double the work" leaving the Caucasian workers free to relax;

b. Being subjected to disparate treatment in that he is subjected to heightened scrutiny in his work performance as he is required to do more work and is held to a higher standard than his Caucasian counter-part, who is often texting or talking on the phone without reprimand;

c. Being subjected to disparate treatment in that he was intentionally ignored and talked around by his supervisor who would address only his Caucasian counterpart despite Plaintiff's presence, and who would direct Plaintiff to an African-American supervisor, while in contrast, similarly situated Caucasian co-workers were not similarly ignored, talked around or directed to African-American supervisors;

d. Being subjected to disparate treatment in that he was unequally denied benefits such as air conditioning, while Caucasian workers nearby had air conditioning, and being forced and/or pressured to work on scheduled days off whereas the Caucasian workers were not denied such things;

e. Being subjected to disparate treatment in the promotion to a mechanic position because as he was denied the opportunity to become a mechanic which has a higher

pension and benefits. Plaintiff Spencer was discouraged and made to feel that he should not apply for a mechanic position and was pushed down before he even applied. While in contrast, similarly situated Caucasian co-workers were not similarly discouraged and made to feel that they should not apply, and they in fact were promoted to mechanic positions;

f. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing a noose hanging in the workplace in 2012, seeing other nooses hung in the workplace; seeing monkey images drawn or displayed in the work place; seeing confederate flags on co-worker's clothing; being shown a racial cartoon on the cell phone of a Caucasian mechanic worker; hearing a Caucasian co-worker singing a phrase "I'll pull a 187 on a no good nigga ass" ("187" is police radio code for murder, death, or kill) in 2012; hearing the word "nigger" spoken by Caucasian workers in the break room in or about August 2012; hearing a Caucasian worker saying the word "nigger" right in front of another African-American worker just before Plaintiff Spencer walked up; hearing about the frequent use of racial slurs by a Rexam supervisor;

g. In addition to the items identified herein, Plaintiff Spencer was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

76.     Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

77.     During Plaintiff Spencer's employment, Defendant was aware of Plaintiff Spencer's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff Charles Stacker's Individual Claims**

78.     Plaintiff Stacker started working as a Manufacturing Supervisor and a full-time employee for Defendant in 2008, and he is still in the same position that he was when he was hired.

79.     During his employment with Defendant, Plaintiff Stacker was and continues to be subject to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment in the assignment of work tasks as he was assigned more difficult and demanding, and less favorable, tasks such as driving approximately three hours round-trip daily to the Cap Can facility in Elk Grove, Illinois while the Beverage Can facility was down, without being paid any travel expenses for lodging, while in contrast, similarly situated Caucasian co-workers were not assigned such tasks without travel expenses for lodging;

b.  Being subjected to disparate treatment in that he is subjected to heightened scrutiny in his work performance as he always had to prove himself more than the Caucasian supervisors, and he was unequally blamed and ridiculed for the plant not running correctly while in contrast, similarly situated Caucasian co-workers did not have to

prove themselves in the same way, and they were not similarly blamed and ridiculed for the plant not running correctly;

c. Being subjected to disparate treatment by not receiving raises and bonuses, while in contrast, similarly situated Caucasian co-workers received raises and did not get docked pay when overpaid; being subjected to disparate treatment in the training, transfer and/or promotion to better positions because during his employment at Rexam, he was never promoted to a better position, never invited to attend the "Rexam Academy" despite requesting better positions, and he is still in the same position that he was when he was hired, while in contrast, similarly situated Caucasian co-workers were transferred and/or promoted to better positions;

d. Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing the May 2012 noose which was hung in the workplace; seeing a second noose which was hung in the workplace; hearing about other nooses hung in the workplace; seeing confederate flags and swastikas displayed by Caucasian co-workers in the workplace; seeing photos of monkey images displayed in the workplace; being called "Boy" by a visiting Plant Manager who said, "Chop, chop … come on, Boy;" hearing a Caucasian worker frequently use the term "nigger;" hearing about other Caucasian workers and supervisors who frequently used the term "nigger;" being physically shoved by a supervisor who was never reprimanded and hearing about supervisors who stalked and physically threatened other African-American employees;

e. In addition to the items identified herein, Plaintiff Stacker was further exposed to the racially intolerant work environment by hearing about, through co-worker

conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

80.     Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

81.     During Plaintiff Stacker's employment, Defendant was aware of Plaintiff Stacker's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff Brenda Taylor-Turner's Individual Claims**

82.      Plaintiff Taylor-Turner started working as a Final Inspector and a full-time employee for Defendant in 2001. Plaintiff Taylor-Turner currently works for Defendant as a Palletizer Operator and has had this position since 2010.

83.     During her employment with Defendant, Plaintiff Taylor-Turner has been subjected to discrimination on account of her race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment by being denied adequate training which prevented her advancement at Rexam, while in contrast, similarly situated Caucasian co-workers received adequate and proper training;

b.  Being subjected to disparate treatment in the punishment and/or discipline for errors such as making mistakes in the canning process and "running bad cans" while in contrast, similarly situated Caucasian co-workers were not similarly punished and/or

disciplined, and in some cases not punished at all, for similar or worse errors or misconduct;

c. Being subjected to disparate treatment in that she is subjected to heightened scrutiny in her work performance as she unequally blamed and punished for her mistakes and the mistakes of Caucasian co-workers, and was yelled at and cursed out for allegedly running too slow, and having problems with the processing line, changing labels and can defects while in contrast, similarly situated Caucasian co-workers performing identically to Plaintiff Taylor-Turner were not similarly blamed and punished for their mistakes and the mistakes of Caucasian or publically chastised;

d. Being subjected to disparate treatment in the assignment of work tasks as she was assigned more difficult and demanding, and less favorable, tasks such as forced overtime work which was supposed to be voluntary, and "change overs" or changing can labels without the help required and without proper training, while in contrast, similarly situated Caucasian co-workers were not forced to work overtime involuntarily and were not required to do "change overs" without the required help and training;

e. Being subjected to disparate treatment in the transfer and/or promotion to better positions at Rexam such as being able to transfer to the mechanics position which affords better pension and benefits and less on sight supervision, or promoted to a better position or a supervisor position while in contrast, similarly situated Caucasian co-workers have been transferred and/or promoted to better positions and have been made supervisors;

f.  Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing photos of the May 2012 noose which was hung in the workplace; seeing confederate flags and swastikas displayed by Caucasian co-workers in the workplace; seeing photos of monkey images displayed in the workplace; listening to co-workers tell her of all kinds of racial slurs in the workplace; hearing from a co-worker that a Caucasian male co-worker made comments specifically about her because she is a black woman such as the sexually graphic comments made by a Caucasian coworker about the anatomy of "black women" including their breasts and detailing graphic sexual acts that he wanted to do with her;

g.  In addition to the items identified herein, Plaintiff Taylor-Turner was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

84.    Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

85.    During Plaintiff Taylor-Turner's employment, Defendant was aware of Plaintiff Taylor-Turner's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff David Taylor's Individual Claims**

86.    Plaintiff Taylor started working as a Palletizer Operator and a full-time employee for Defendant on or about April 9, 2012. Plaintiff Taylor was unlawfully terminated by Defendant on or about June 8, 2012 and is no longer employed at Rexam.

87.    During his employment with Defendant, Plaintiff was subjected to discrimination due to his race. Examples of this discrimination include, but are not limited to, the following:

a.   Being subjected to disparate treatment in the assignment of work tasks as he was assigned more difficult and demanding, and dangerous tasks such as climbing a ladder two stories high, and putting his arm and head inside a broken machine, while it was running and moving back and forth at approximately 30 mph, for hours while in contrast, similarly situated Caucasian co-workers were not forced to do such a task;

b.   Being subjected to disparate treatment in that he was subjected to heightened scrutiny in his work performance as he was watched more heavily than his Caucasian counterparts, he was told he wasn't doing his job despite the data showing that he did the same or better than his Caucasian counterparts, and he was unequally blamed and/or disciplined and/or punished for his mistakes, the mistakes of others, or common equipment errors while in contrast, similarly situated Caucasian co-workers were not similarly blamed and/or disciplined and/or punished for their mistakes or common equipment errors;

c.   Being subjected to disparate treatment by not receiving adequate and proper training while in contrast, similarly situated Caucasian co-workers received adequate and proper training;

d.  Being subjected to disparate treatment by not receiving overtime while in contrast, similarly situated Caucasian co-workers received more overtime;

e.  Being subjected to disparate treatment in the requirement to undergo testing prior to hiring while in contrast, similarly situated Caucasian co-workers did not have to undergo testing;

f.  Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing a swastika on a Caucasian co-worker's tool box; seeing a picture of the May 2012 noose; being called a "drug dealer" and ostracized by Caucasian co-workers, hearing a Caucasian supervisor use the word "nigger" over his cell phone;

g.  In addition to the items identified herein, Plaintiff Taylor was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

88.     Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

89.     During Plaintiff Taylor's employment, Defendant was aware of Plaintiff Taylor's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

90.     Plaintiff Taylor was wrongfully terminated after being given a good review by his supervisor and without any disciplinary write-ups or reason, and just three days before his "probation" period ended.

**Plaintiff Natasha Turner-Randle's Individual Claims**

91.     Plaintiff Turner-Randle started working as a Final Inspector and a full-time employee for Defendant in 2001. Plaintiff Turner-Randle currently works for Defendant as a Palletizer Operator and has had this position since 2010.

92.     During her employment with Defendant, Plaintiff Turner-Randle has been subjected to discrimination on account of her race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment by not receiving any training or adequate training, while in contrast, similarly situated Caucasian co-workers received adequate and proper training;

b.  Being subjected to disparate treatment in the punishment and/or discipline for errors such as making mistakes in the canning process and "running bad cans" while in contrast, similarly situated Caucasian co-workers were not similarly punished and/or disciplined, and in some cases not punished at all, for similar or worse errors or misconduct;

c.  Being subjected to disparate treatment in the assignment of work tasks as she was assigned more difficult and demanding, and less favorable, tasks;

d.  Being subjected to disparate treatment in the transfer and/or promotion to better positions because during her employment at Rexam, she has never been promoted to a better position or a supervisor position while in contrast, similarly situated

Caucasian co-workers have been transferred and/or promoted to better positions and have been made supervisors;

e.  Being subjected to racially offensive images, symbols, slurs, and language in the workplace such as: seeing photos of the noose in May of 2012; seeing photos of the monkey images in the work place; hearing from a co-worker that a Caucasian male co-worker made comments specifically about her because she is a black woman such as the sexually graphic comments made by a Caucasian coworker about the anatomy of "black women" including their breasts and detailing graphic sexual acts that he wanted to do with her;

f.  In addition to the items identified herein, Plaintiff Turner-Randle was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility.

93.     Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant, due to their race.

94.     During Plaintiff Turner-Randle's employment, Defendant was aware of Plaintiff Turner-Randle's complaints as enumerated above, but failed to take corrective action or prevent further discrimination.

**Plaintiff Sharon Preston's Individual Claims**

95.     Plaintiff Preston worked for Defendant at the Cap Can Facility from July of 2007 to March 29, 2013.

96.     During her employment with Defendant, Plaintiff Preston was subjected to discrimination due to her race. Examples of this discrimination include, but are not limited to, the following:

a.  Being subjected to disparate treatment in that Caucasian co-workers with less experience, or no experience at all, were given higher paying positions that Plaintiff Preston. Plaintiff initially worked at Rexam through a third party temporary agency. She was subsequently offered "the highest paying position" by Rexam management who induced Plaintiff Preston to leave the employ of the temporary agency, which she did.  Plaintiff Preston reported to Rexam on July 23, 2007 where Defendant told her she would be placed in a lower paying position and her start day would be July 24, 2007;

b.  Being subjected to disparate treatment in that Caucasian co-workers with less experience than Claimant, who either started with Claimant or in the weeks and months following her start date, were placed in higher paid more desirable positions;

c.  Being subjected to disparate treatment in that Claimant was ordered by her Caucasian supervisor to train and clean up after Caucasian co-workers with less experience than her, or no experience at all and who were placed in higher paid positions than Plaintiff Preston;

d.  Being subjected to disparate treatment in the assignment of work tasks as she was assigned more difficult and demanding, and less favorable, tasks such as cleaning jobs while in contrast, similarly situated Caucasian co-workers were not assigned such tasks;

e.  Being subjected to racially offensive slurs, and language in the workplace such as: hearing Caucasian co-workers and supervisors say "Call monkey boy" "Get monkey boy to do it" and "Where is monkey boy?" in reference to an African-American employee; hearing "Only blacks would put an empty bowl in the refrigerator" in reference to an African-American employee who would put a clean bowl in the refrigerator after lunch so he wouldn't forget it at the end of the day; hearing other racially offensive comments from Caucasian co-workers, including "What's the name of that instrument that all you black people play?"

f.  In addition to the items identified herein, Plaintiff Preston was further exposed to the racially intolerant work environment by hearing about, through co-worker conversations, additional instances of racially offensive images, symbols, slurs, and language directed by Caucasian co-workers towards the African-American employees at the Beverage Can Facility and Cap Can Facility.

97.  Similarly situated Caucasian co-workers were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Defendant.

98.  During Plaintiff Preston's employment, Defendant was aware of her complaints as enumerated above, but failed to take corrective action or prevent further discrimination. Caucasian management would respond to reports of racial slurs in the workplace by stating, "Just don't say anything" and "Just ignore him."

## COUNT I

## DISCRIMINATION AGAINST THE NAMED PLAINTIFFS AND THE CLASS IN VIOLATION OF 42 U.S.C. §1981

99.  Plaintiffs repeat and re-allege each allegation above as if set forth herein in full.

100.     Defendant has subjected its African-American employees to different terms and conditions of employment than similarly situated Caucasian co-workers and has intentionally discriminated against Plaintiffs and the Class in violation of Section 1981 by (1) allowing a racially hostile work environment to exist by not taking sufficient actions to stop nooses and other racially offensive symbols and images, such as swastikas, monkeys and confederate flags from being openly exposed in the workplace, allowing racial slurs and racially hostile statements from being spoken directly to Plaintiffs and/or spoken publically to others in Plaintiffs' presence, to intimidate and isolate the African-American employees; (2) applying training programs in a disparate manner so as to allow promotional practices which give seniority to Caucasian workers that have worked for the Defendant for either less or equal time than similarly situated African-American employees; (3) applying disciplinary actions in a discriminatory fashion against African-Americans; (4) refusing to respond to or not taking sufficient actions about complaints from African-American employees about the hostile work environment; (5) Plaintiffs have suffered additional injuries and damages after filing their charges of discrimination against Defendants through Defendants' retaliatory acts exemplified by heightened racial intolerance in the workplace such as; increased racial slurs, death threats, another noose, physical and verbal abuse directly pinpointing and chastising those who filed charges, and more monkey images left in the workplace.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and the Class respectfully request that this Court grant the following relief:

a.  Certification of a Class consisting of all African-American employees employed at Defendant's Beverage Can and Cap Can Facilities from April 1, 2010 to present;

b.  Enter judgment that Defendant's acts and practices as set forth herein are in violation of the laws of the United States;

c.  Enter preliminary and permanent relief enjoining the discriminatory conduct and requiring Defendant to take steps to end its discriminatory practices and prevent current and future harm to Plaintiffs and the Class, including, but not limited to:

    i.  Revised procedures which would require that Defendant's managers use fair and objective criteria when promoting employees;

    ii.  Revised procedures which would require that Defendant's disciplinary procedures not be applied in an arbitrary or discriminatory fashion;

    iii.  Implementation of a meaningful system of oversight to ensure that Defendant managers are using objective criteria to assign overtime, shift schedules, job assignments, and benefits such as hiring and promotions; and

    iv.  Implementation of meaningful procedures to ensure racial harassment in the workplace is eliminated.

d.  Award Plaintiffs and the Class lost wages, including back pay for failure to promote, and any lost benefits that would otherwise have been available to the Plaintiffs and Class without the discrimination;

e.  Award Plaintiffs and the Class compensatory and punitive damages;

f.  Award reinstatement to class members who resigned due to race discrimination;

g.  Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

h.  Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

Pleading a supplemental Illinois statutory claim, Plaintiffs allege as follows:

## COUNT II

## VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT

101.     Plaintiffs repeat and re-allege each allegation above as if set forth herein in full.

102.     Plaintiffs filed individual Charges of Discrimination with the IDHR that were cross-filed with the EEOC (Group Exhibit 1).

103.     The charges of discrimination claim discrimination because of race, African American.

104.     Plaintiff Sharon Preston's charge of discrimination claims discrimination because of race, sex, disability, and retaliation.

105.     The IDHR issued Notices of Dismissal on the Charges of Discrimination for Plaintiffs Clarence Brown, Timothy Greenlee, Deborah Hobbs, Desir Martial, Madison Moon, Dylan Palmer, Craig Perry, Jamika Randle, Sammie Spencer, Charles Stacker, Brenda Taylor-Turner, David Taylor, and Natasha Turner-Randle. All Notices of Dismissal were issued within the requisite number of days. Plaintiffs received the Notices of Dismissal and are filing this claim within the requisite number of days.

106.     At all times relevant to this Complaint, the Illinois Human Rights Act was in place to effectuate relief for civil rights violations against workers in Illinois. 775 ILCS 5/1-103 et seq.

107.     At all times relevant to the incidents complained of herein, Defendant was an "employer" as defined by §2-101(B)(1)(b) of the Human Rights Act and is subject to the provisions of the Human Rights Act.

108.    At all times relevant Plaintiffs were "employees" as defined by §2-201(A) of the Human Rights Act.

109.    This Court has jurisdiction over Plaintiffs' claims under §7A1-102(G) of the Human Rights Act. 775 ILCS 5/7A-102(G). Plaintiff has fulfilled all conditions precedent to bringing his claims in a state court or other supplemental proceeding.

110.    As the facts described herein explain and the acts taken against Plaintiffs show, Defendant has discriminated against Plaintiffs in direct violation of the Illinois Human Rights Act in the terms and conditions of Plaintiffs' employment, in the issuance of discipline and in all aspects of employment including evaluation, promotion and termination in violation of the Human Rights Act.  775 ILCS §5/2-102 (A).

111.    Defendant's actions constitute malicious and reckless indifference to Plaintiffs' protected rights.

112.    As a proximate result of the racially discriminatory treatment alleged above, Plaintiffs have individually suffered loss of income, loss of other monetary benefits, loss of future business opportunities and other forms of damage including but not limited to emotional pain and suffering.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment in their favor and against Defendant and for the Court to award the following relief:

a.  Back pay, employment benefits and other compensation lost to him as a result of Defendant's racial discrimination;

b.  Pre-Judgment interest on the award of back pay, lost employment benefits, and other compensation lost to him as a result of the Defendant's racial discrimination;

c.  Compensatory damages for the harm he suffered as a result of Defendant's racial discrimination;

d.  Reasonable attorney's fees, expert witness fees expenses and costs of this action and of prior administrative actions; and

e.  Such other relief as this Court deems just and appropriate.

## COUNT III

## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

113.  Plaintiffs repeat and re-allege each allegation above as if set forth herein in full.

114.  Defendant has subjected Plaintiffs to different terms and conditions of employment than similarly situated Caucasian co-workers and have intentionally discriminated against Plaintiffs in violation of 42 U.S.C. § 2000e *et seq* by: (1) allowing a racially hostile work environment to exist by not taking sufficient actions to stop racially charged symbols and images from appearing in public areas of the workplace, stop racial slurs and racially hostile statements from being spoken publically in the workplace, stop employees from wearing racially charged clothing and; (2) applying training, hiring and promotional practices which give seniority to Caucasian workers that have worked for the Defendant for either less or equal time than Plaintiffs; (3) applying disciplinary actions in a discriminatory fashion against Plaintiffs; (4) refusing to respond to or not taking sufficient actions about complaints from Plaintiffs about the hostile work environment; (5) retaliating against Plaintiffs for complaining about the racially hostile work environment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

a. Enter judgment that Defendant acts and practices as set forth herein are in violation of the laws of the United States and the State of Illinois;

b. Enter preliminary and permanent relief enjoining the discriminatory conduct and requiring Defendant to take steps to end its discriminatory practices and prevent current and future harm to Plaintiffs, including, but not limited to:

    i. Revised procedures which would require that Defendant's managers use fair and objective criteria when promoting employees;

    ii. Revised procedures which would require that Defendant's disciplinary procedures to be applied in a non-discriminatory fashion;

    iii. Implementation of a meaningful system of oversight to ensure that Defendant's managers are using objective criteria to assign overtime, shift schedules, job assignments, and benefits such as hiring and promotions; and

    iv. Implementation of meaningful procedures to ensure racial harassment at the Chicago Heights facility is eliminated.

c. Implementation of meaningful procedures to ensure that racial discrimination at the Defendant's facilities is eliminated.

d. Award Plaintiffs lost wages, including back pay for failure to promote, and any lost benefits that would otherwise have been available to the Plaintiffs without the discrimination;

e. Award Plaintiffs compensatory and punitive damages;

f. Award reinstatement to Plaintiffs who resigned due to race discrimination;

g. Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees and costs; and

h. Grant Plaintiffs such other and further relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues of facts and damages in this action.


Respectfully submitted by the above-named Plaintiffs through their Attorneys:


BY: _____

MICHAEL BRESSLER
*ONE OF PLAINTIFFS' ATTORNEYS*

MICHAEL BRESSLER
THE BRESSLER FIRM LLC
858 W. ARMITAGE AVENUE 150
CHICAGO, ILLINOIS 60614
(312) 497-2325; ATTORNEY NO. 627897

CAROL COPLAN BABBITT
THE LAW OFFICE OF CAROL COPLAN BABBITT
35 E. WACKER DR., SUITE 650
CHICAGO, ILLINOIS 60601
(312) 435-9775; ATTORNEY NO. 6199651